UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

JEROME YELDER,                    )
                                  )
          Plaintiff,              )
                                  )  Cause No.: 2:18-CV-10576 – TGB-SDD
vs.                               )
                                  )  Judge Terrence G. Berg
NORFOLK SOUTHERN                  )  Magistrate Judge Stephanie
RAILWAY CO.,                      )  Dawkins Davis
                                  )
          Defendant.              )

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Jerome Yelder by and through his attorneys in the above-captioned matter, and pursuant to Fed. R. Civ. P. 56 and Local Rules 5.1 and 7.1. for his Response in Opposition to Defendant's Motion for Summary Judgment states that contrary to Defendant's Motion: 1) Plaintiff's discrimination claims are not precluded by the Railway Labor Act; 2) Plaintiff can establish *prima facie* cases for discrimination and retaliation; and 3) Plaintiff can establish a *prima facie* case that Defendant's proffered reason for terminating Plaintiff is pretextual. Therefore, Defendant's Motion for Summary Judgment should be denied.

Respectfully Submitted,

HOLLAND LAW FIRM,

 _/s/ Carl Kessinger_
Carl Kessinger (#6200167)
Eric D. Holland (#6207110)
Holland Law Firm, LLC
300 N. Tucker, Suite 801
St. Louis, MO 63101
Tel 314-241-8111
Fax: 314-241-5554
ckessinger@allfela.com

And

John A. Tosto (P56579)
JOHN A. TOSTO, PLC
The Mott Foundation Building
503 S. Saginaw Street, Suite 1410
Flint, MI 48502
Tel: (810) 244-5862
john@jtmblaw.com
_Local Counsel for Plaintiff_

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing was filed with the Court's Electronic Filing System on this 14th day of August 2019 and sent to the foregoing via:

_____ U.S. Postage Prepaid, U.S. Mail
_____ Facsimile at (XXX) XXX-XXXX
__x___ Electronic Mail
_____ Hand Delivery

Samuel E. Endicott
Joseph Charles Devine
BAKER & HOSTETLER, LLP
200 Civic Center Drive, Ste. 1200
Columbus, OH 43215
Tel: (614) 462-2614
sendicott@bakerlaw.com
jdevine@bakerlaw.com
_Attorney for Defendant Norfolk Southern_

AND

Joseph J. McDonnell
Mary C. O'Donnell
Gallagher Sharp
211 W.  Fort Street, Ste. 1600
Detroit, MI 48226
Tel: 313-963-3033
jmcdonnell@gallaghersharp.com
modonnell@gallaghersharp.com
*Attorneys for Defendant Norfolk Southern*

*/s/ Carl Kessinger*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

JEROME YELDER,                  )
                                )
              Plaintiff,         )
                                )   Cause No.: 2:18-CV-10576 – TGB-SDD
vs.                             )
                                )   Judge Terrence G. Berg
NORFOLK SOUTHERN                )   Magistrate Judge Stephanie
RAILWAY CO.,                    )   Dawkins Davis
                                )
              Defendant.         )

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jerome Yelder by and through his undersigned attorneys submits his

Brief in support of his Response in Opposition to Defendant's Motion for Summary

Judgment in accordance with Fed. R. Civ. P. 56 and Local Rules 5.1 and 7.1.

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

ISSUE PRESENTED ............................................................................ iv

CONTROLLING AND MOST APPROPRIATE AUTHORITY ............................ v

COUNTER-STATEMENT OF MATERIAL FACTS ................................................ 1

PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS ............... 4

    A.    Additional Facts Regarding Plaintiff's Work In The
Detroit/Toledo Pool ................................................................ 4

    B.    Additional Facts Regarding Defendant's Investigation
Into Plaintiff's March 15, 2017 Discrimination Claim ........................ 5

    C.    Additional Facts Regarding The Events Of April 21, 2017 ................. 6

    D.    Additional Facts Regarding Defendant's Investigation
Of The April 21, 2017 Events ............................................ 12

LAW AND ARGUMENT ...................................................................... 15

    I.    Resolution of Plaintiff's Race Discrimination Claims
Does Not Require Interpretation Of The Collective
Bargaining Agreement, So The Claims Are Not
Precluded By The Railway Labor Act ................................. 15

    II.    The Evidence Is Sufficient To Establish A *Prima Facie*
Case of Discrimination ....................................................... 17

    III.    The Evidence Is Sufficient To Establish A *Prima Facie*
Case of Causation For Plaintiff's Retaliation Claim ........................ 18

    IV.    Plaintiff Can Prove That Defendant's Termination
Reason Was Pretextual ........................................................ 19

    V.    Conclusion ........................................................................ 24

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Chattman v. Toho Tenax America, Inc.,*
    686 F.3d 339 (6th Cir. 2012)...................................................................18, 19

*Singfield v. Akron Metropolitan Housing Authority,*
    389 F.3d 555 (6th Cir. 2004)...........................................................................19

*Stanley v. ExpressJet Airlines, Inc.,*
    356 F.Supp.3d 667 (E.D. Mich. 2018)......................................................15, 16

*Taylor v. Geithner,*
    703 F.3d 328 (6th Cir. 2013).........................................................................18

*Wright v. Murray Guard, Inc.,*
    455 F.3d 702 (6th Cir. 2006).................................................................17, 19, 20

**Statutes**

Railway Labor Act.................................................................................15, 16, 17, 24

## ISSUE PRESENTED

1.      Whether the Railway Labor Act precludes Plaintiff's race discrimination claim such that summary judgment should be granted.

2.      Whether there is a genuine disputed issue of material fact as to whether Plaintiff was treated differently than similarly situated non-African American employees such that summary judgment in Plaintiff's race discrimination claims should be denied.

3.      Whether there is a genuine disputed issue of material fact as to whether Defendant's reason for Plaintiff's termination was pretextual such that summary judgment in Plaintiff's race discrimination claims should be denied.

4.      Whether there is a genuine disputed issue of material fact as to whether Defendant would have terminated Plaintiff had Plaintiff not made the internal complaint of discrimination to Defendant.

5.      Whether there is a genuine disputed issue of material fact as to whether Defendant's reason for Plaintiff's termination was pretextual such that summary judgment in Plaintiff's retaliation claim should be denied.

## <u>CONTROLLING AND MOST APPROPRIATE AUTHORITY</u>

*Chattman v. Toho Tenax America, Inc.,* 686 F.3d 339 (6th Cir. 2012).

*Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555 (6th Cir. 2004).

*Stanley v. ExpressJet Airlines, Inc.,* 356 F.Supp.3d 667 (E.D. Mich. 2018).

*Taylor v. Geithner*, 703 F.3d 328 (6th Cir. 2013).

*Wright v. Murray Guard, Inc.,* 455 F.3d 702 (6th Cir. 2006).

## COUNTER-STATEMENT OF MATERIAL FACTS

1.     Admit.

2.     Admit.

3.     Admit.

4.     Admit.

5.     Admit.

6.     Admit.

7.     Dispute. Plaintiff disputes that crews were not called by names.  *Yelder* Decl, Ex. 1, ¶ 7.

8.     Admit.

9.     Admit.

10.    Admit.

11.    Admit.

12.    Admit.

13.    Admit.

14.    Admit.

15.    Admit.

16.    Admit.

17.    Admit.

18.    Admit.

19.    Admit.

20.     Admit.

21.     Admit.

22.     Admit.

23.     Admit.

24.     Admit.

25.     Admit.

26.     Admit.

27.     Dispute. Plaintiff disputes that the cited material establishes that it was a few minutes into the drive when Plaintiff believed the driver was taking the wrong route and asked him if they were going to the hotel.

28.     Dispute. Plaintiff disputes that the cited material establishes that Plaintiff "struck the driver in the chest." According to the cited material, Plaintiff's deposition, when asked: "You swung your left arm with a closed hand striking him in the chest?", Plaintiff answered: "Perhaps. I touched his chest. I do believe that." *Yelder* dep., Ex 4, p. 80.

29.     Dispute. Plaintiff disputes that the cited materials establish that the driver was "stuck". *See* No. 28 regarding Plaintiff's deposition testimony. The other document cited, Jackwak's Declaration, does not state that the driver was "struck" in any of the paragraphs referenced.

30.     Dispute. This is disputed for the reason that the purported fact is not contained in Mr. Jackwak's original handwritten statement. Jackwak stmt., Ex. 2.

31.     Admit.

32.     Admit.

33.     Admit.

34.    Admit.

35.    Dispute. Plaintiff disputes that the cited material, Ex. 2 to Plaintiff's deposition, states that Plaintiff admits "to assaulting the taxi driver".

36.    Admit.

37.    Dispute. Plaintiff disputes that the cited material contains any admission to the effect that Plaintiff "tried to take control of the vehicle".

38.    Dispute. Plaintiff disputes that the cited material contains any reference to Plaintiff having "admitted assaulting the PTI driver".

39.    Admit.

40.    Admit.

41.    Dispute. Plaintiff disputes that the cited material contains any reference to Plaintiff having "admitted that he assaulted the driver".

42.    Admit.

43.    Admit.

44.    Dispute. Plaintiff disputes that the cited material contains any reference to the effect that "Grace's decision to terminate Yelder's employment had nothing to do with Yelder's race or his complaint of race discrimination."

45.    Admit.

46.    Dispute. Plaintiff disputes that the cited material contains any reference to the five terminated employees having been White.

47.    Dispute. Plaintiff disputes that the cited material state that the Public Law Board found Plaintiff guilty of violating Defendant's rules.

3

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

**A.   Additional Facts Regarding Plaintiff's Work In The Detroit/Toledo Pool.**

1.     Plaintiff, Jerome Yelder, is African American. (Elium dep., Ex. 3, p. 38-39; Ex. 3 to Elium dep., Ex. 3, NS2818).

2.     From August 2016 until his termination in April 2017 Plaintiff worked as a conductor for Defendant in the Detroit/Toledo Pool ("D/T Pool"). (*Yelder* Decl., Ex. 1 ¶ 6).

3.     The conductors and engineers composing the pool members had to successfully bid into the pool in order to be regularly assigned to it. (*Yelder* dep., Ex. 4, p. 28; Grace dep., Ex. 5, p. 66). There were nine (9) or 10 regularly assigned conductors in the Pool while Plaintiff worked in it. Plaintiff was the only African-American. All the others were Caucasian. (*Yelder* Decl., Ex. 1, ¶ 13).

4.     Regularly assigned employees that had successfully bid to work in the D/T Pool were not the only employees working it. Vacancies were filed by employees on the "extra board" which is a list of employees used to fill vacancies created by regularly assigned employees that were unavailable to work. (Grace dep., Ex. 5, 66; Decker dep., Ex. 6, pp. 38-39).

5.     The regularly assigned D/T Pool workers were called in to work by name. (*Yelder* Decl., Ex. 1, ¶¶ 7, 8).

6.     The Detroit/Toledo Pool has some assignments that paid more than others. "Deadheads" were higher paying assignments. "Deadheads home" and "held-aways" also most often resulted in higher pay. (*Yelder* Decl., Ex. 1, ¶ 19).

7.     The assignments are assigned on a "first in, first out" basis. There is a rotating list, and the first individual to get into the terminal would be at the top of the list and be first out to get the next assignment. Conductors and engineers would work their way from the bottom of the list to the top.  (Elium dep., Ex. 3, pp. 63-64; Grace dep., Ex. 5, pp. 67-68).

8.     While working as a conductor in the D/T Pool for Defendant from August 2016 through April 2017, based on his personal observations of Defendant's computer screens identifying them, Plaintiff personally observed that deadheads, deadheads home, and/or held-aways, were mostly called when the non-African American – caucasion – employees were positioned on the list ahead of him or after he was called for standard work, so that the assignments would go to them, the non-African Americans/Causasions instead of Plaintiff, an African American. (*Yelder* Decl., Ex. 1, ¶ 18).

**B.     Additional Facts Regarding Defendant's Investigation Into Plaintiff's March 15, 2017 Discrimination Claim.**

9.     On March 15, 2017, Plaintiff sent an email to Michael Grace, then Division Superintendent of Defendant's Dearborn Division, reporting that Plaintiff

was being discriminated against with respect to the deadhead and held-away assignments. (*Yelder* dep., Ex. 4, pp. 41-42; Grace dep., Ex. 5, p. 8).

10.     Mr. Grace emailed Defendant's EEO officer, Susan Decker. (Decker dep., Ex. 6, pp. 13, 16). She then began to gather information. (*id.* at 18).   The specific subjects or topics investigated by Ms. Decker were: 1) Plaintiff's complaint that he was the only African American in the D/T Pool; 2) Plaintiff's complaint that he was denied opportunities to deadhead; and 3) Plaintiff's complaint that his earning potential was being decreased. (*id.* at 16-17, 24).

11.     Ms. Decker concluded that Plaintiff was not the only African American in the pool, that he deadheaded 32 times and was one of the top 10 people allowed to deadhead, and that he was one of the top earners. (*id.* at 24-25). In performing her analysis, Ms. Decker included not only those employees regularly assigned to the D/T Pool, but anyone that worked in the pool from August 2016 to March 2017; even those from the extra board. (*id.* at 38, 57-58).

## C.     Additional Facts Regarding The Events Of April 21, 2017.

12.     According to Michael Grace there was no issue with the fact that Plaintiff utilized the PTI vehicle. (Grace dep., Ex. 5, p. 71). Mr. Grace was Respondent's Division Superintendent of its Dearborn Division. (*id.* at 7-8). He held management positions with Respondent from 1984 until retiring at the end of April 2018. (*id.* at 7).

13.     They exited the parking lot. Plaintiff knows the roads in the area. (*Yelder* dep., Ex. 4, p. 73). The driver started toward Summit Street. Complainant asked the driver if they were going to the hotel. The driver failed to respond. He then took a right on Summit Street, when he should have gone left. (*id.* at 74).

14.     Trainmaster Gerald Simon was one of Defendant's supervisors in Toledo, Ohio. (Grace dep., Ex. 5, pp. 15-16).  Mr. Simon prepared a statement in which he notes that he spoke with PTI branch manager, Kristi Pearson, who determined that the vehicle was not taking the assigned route to the hotel. (*id.* at 17-20).

15.     According to Mr. Gaines, Respondent's § 18.64(b)(6) representative, Plaintiff's PTI driver did not have an assigned route. (Gaines dep., Ex. 9, pp. 7, 33).

16.     Defendant's materials concerning its investigation into the incident include a series of emails by PTI personnel. One of the emails notes that the driver chose a different route. Another reveals that the driver took a route not usually favored by the crews. (Grace dep., pp. 21-23).  According to Mr. Grace, Defendant's investigation into the incident revealed that the driver took a different route not usually favored by the crews. (*id*. at 23).

17.     Mr. Gaines, Defendant's § 18.64(b)(6) representative selected by Defendant to testify as to "Defendant's investigation into the April 21, 2017 incident involving Plaintiff and a PTI driver", never saw the series of emails from PTI

regarding the April 21, 2017 event which are a part of Defendant's investigation into the incident, before his March 7, 2019 deposition. (Gaines dep., Ex. 9, pp. 7, 9-10, 37-38; Exs. 2 and 6 to Gaines dep., Ex. 9; Grace dep., Ex. 5, p. 21, Ex. 3 to Grace dep., Ex. 5).

18.    Mr. Siffre, Plaintiff's supervisor, was in charge of Defendant's investigation into the incident. Mr. Siffre knows there were preferred routes the PTI drivers were to take from the Toledo Terminal to the hotel, because he was told this by someone from PTI during the course of his investigation. (Siffre dep., Ex. 7, pp. 15-16, 25).

19.    Prior to his June 20, 2019 deposition Mr. Siffre never saw the chain of emails from PTI regarding the April 21, 2017 incident, which emails were, according to Mr. Grace, part of the investigation into Plaintiff's April 21, 2017 incident.  (Siffre dep., Ex. 7, pp. 25, 27, 47-48, Ex. 2 to Siffre dep., Ex. 7; Grace dep., Ex. 5, p. 21, Ex. 3 to Grace dep., Ex. 5).

20.    As they approached Broadway Street, about one (1) to two (2) minutes after asking him for the first time, Plaintiff again asked the driver if they were going to the hotel. The driver again failed to respond. The driver turned left onto Broadway heading north when he should have gone right. The driver continued to head north. For the third time, maybe a minute after asking him for the second time, Plaintiff asked the driver if he was going to the hotel. The driver looked at Plaintiff and rolled

his eyes, failing to respond yet again. Plaintiff then asked the driver to pull over and let him out. The driver did not say anything. Plaintiff picked up the microphone attached to the dashboard which allows the vehicle to communicate with the Maumee Bridge Operator. (*Yelder* dep., Ex. 4, pp. 74-77).

21.    According to the results of Respondent's investigation, Complainant asked the driver three (3) times where he was taking them, and did not receive any response. (Grace dep., Ex. 5, p. 72).

22.    The Maumee Bridge Tender operates the bridge and coordinates PTI shuttle cabs. She is an employee of Respondent. (*id*. at 19). Plaintiff told her that his driver was going in the opposite direction he should have been going, that the driver would not say where he was taking them, and that the driver would not let them out of the vehicle. (*Yelder* dep., Ex. 4, p. 77).

23.    While the mic was on Plaintiff again asked the driver if he was going to let him out or going to stop. The driver gave Plaintiff a sinister look and sped up. (*id.* at 77-78). Plaintiff then dropped the mic and reached over to try to stop the vehicle by trying to put his hands on the wheel. The driver swung his right arm and knocked Plaintiff back into his seat, still remaining silent. Plaintiff then tried to reach over with his right hand to try to turn the ignition. As he was reaching over, the driver knocked Plaintiff's hand away with his (the driver's) hand. At this point, Plaintiff used his left arm and swung it with a closed hand into the driver's chest in

9

order to shove the driver back into his seat. The driver continued on, failing to say anything. Plaintiff told the driver that he did not know him, and he needed to let Plaintiff out of the vehicle. (*id.* at 78-81).

24.     According to the results of Respondent's investigation, Complainant asked the driver to pull over three (3) times, failing to get a response each time. (Grace dep., Ex. 5, p. 73).

25.     Pursuant to Mr. Grace it was reasonable for Plaintiff to be concerned with the safety of himself and his engineer after the PTI driver did not respond when asked three (3) times where they were going and to stop the vehicle and pull over. (*id.* at 55).

26.     Complainant was frantic. The driver kept on driving until reaching the darkest stretch of the road, at which point he just stopped. Complainant managed to turn the ignition and shut off the vehicle. He then jumped out of the vehicle and headed towards the rear of it. Complainant then noticed a figure in the darkness on the street corner. He removed his belongings from the rear of the van, searching for his cell phone in them. The driver then was able to start the vehicle. When he started it the person on the corner pulled a hoody over his or her head, and began walking towards Complainant. Complainant was "going out of his mind". He grabbed his phone. The driver reached over and closed Complainant's door, rolled down the window, and said in his sinister voice, "Get back in here". Complainant said he was

10

calling the police. When he said that, the hooded figure stopped his/her approach, and ran off in the opposite direction. The driver also left the scene. (*Yelder* dep., Ex. 4, at 81-85).

27.    Upon arriving at the hotel Plaintiff called the assistant chief dispatcher. He told her what had happened, that he wanted to make a police report, and that he wanted to see a supervisor. She said she would get a trainmaster there. Trainmaster Gerry Simon then called and said he would be there soon because he needed statements, and Plaintiff told Mr. Simon that he wanted to make a police report. (*id.* at 93-95).

28.    Plaintiff started his statement at the hotel prior to Mr. Simon's arrival. He completed the statement and provided it to Mr. Simon. Mr. Simon then took Plaintiff to the police department.  (*id*. at 97-101).

29.    The desk sergeant told Plainitff to make a brief statement, and someone would be in contact with him, so that is what Plaintiff did. (*id.* at 101-102).

30.    When Plaintiff returned to Mr. Simon's vehicle after filing his initial police report, Mr. Simon told Plaintiff that he was pulling Plaintiff out of service. (*id.* at 113-114). Mr. Simon then took Plaintiff back to the hotel, and said that Courtney Siffre would pick him up. Mr. Siffre then picked up Plaintiff and dropped him off at his car. When they were about five (5) minutes from their destination, Mr. Siffre asked what happened. Plaintiff explained what had transpired. Mr. Siffre,

Plaintiff's direct supervisor and holder of a management position with Defendant, then said, "So it was in self-defense". (*id.* at 117-118; Siffre dep., Ex. 7, pp. 11-12).

31.   Defendant conducted an investigation regarding Plaintiff's incident. Mr. Siffre was in charge of it. Following the investigation he concluded that Plaintiff should be charged with a rule violation for striking a PTI driver. (Siffre dep., Ex. 7, pp. 25-27).

### D.   Additional Facts Regarding Defendant's Investigation Of The April 21, 2017 Events.

32.   By letter dated April 27, 2017 Plaintiff was notified that he was being charged with conduct unbecoming an employee for striking the driver, and attempting to take control of the steering wheel and to operate the brakes of a moving PTI vehicle. (Investigation Hearing Transcript ["IHT"], Ex. 1 to Siffre dep., Ex. 7, pp. 5-6).

33.   Mr. Siffre was the charging officer.  Mr. Siffre, along with his boss, Nathanial Gaines, and possibly Michael Grace, made the decision to charge Plaintiff. (Siffre dep., Ex. 7, pp. 28-29). The charging officer assesses the facts and develops a charge, and presents those facts and investigation discoveries in a formal hearing. (*id.* at 27-28).

34.   Mr. Siffre was Plaintiff's direct supervisor from January 23, 2017 until Plaintiff's termination. Mr. Siffre does not recall having any problems, issues, difficulty, anything at all with Plaintiff prior to April 21, 2017. Up to April 21, 2017

12

Plaintiff was performing his job to Mr. Siffre's satisfaction; up to Mr. Siffre's expectations and meeting them. (Siffre dep., Ex. 7, pp. 12-13).

35. Plaintiff's investigation hearing was on May 29, 2017. (IHT, Ex. 1 to Siffre dep., Ex. 7, p. 4). The investigation hearing involves the employee, possibly his union representative, a hearing officer, and a charging officer. The charging officer presents the facts of his investigation. He may be questioned by the union representative. (Siffre dep., Ex. 7, p. 30).

36. Mr. Siffre, the investigating and charging officer does not dispute that the driver did not take the preferred route, or that Plaintiff asked the driver where he was taking him and to stop, and did not receive a response from the driver. (*id.* at 25, 27, 71-72).

37. Stephen Myrick was the hearing office for Plaintiff's investigation hearing. (Myrick dep., Ex. 8, p. 16). According to Mr. Myrick Plaintiff should have felt safe even though it is about 10:30 PM, Plaintiff's in a PTI cab with a strange driver, Plaintiff believes the driver is taking an unusual route, Plaintiff asks the driver three (3) times where he's taking him and gets no response, and also asks the driver to pull over three (3) times and does not get a response. (*id.* at 55-56).

38. On May 29, 2017 on their way out after the hearing Mr. Myrick told Plaintiff that he, Mr. Myrick, thought it was going to go in Plaintiff's favor because Plaintiff did really well in the hearing. (*Yelder* dep., Ex. 4, p. 133).  Also on May 29,

2017 following the hearing Mr. Myrick spoke with Mr. Grace, stating that he thought it was going to be a dismissal. (Myrick dep., Ex. 8, 75-76). Mr. Myrick then emailed his dismissal recommendation on June 5, 2017. (*id.* at 83-84). Mr. Grace then made the decision to terminate Complainant, although Mr. Myrick's recommendation certainly played a part in Mr. Grace's ultimate decision to terminate. (Grace dep., Ex. 5, p. 32, 35). By letter over Mr. Myrick's signature dated June 12, 2017, Complainant was notified of his termination. (Myrick dep., Ex. 8, pp. 76-77).

39.     Mr. Myrick, the investigation hearing officer that recommended dismissal, admits that he does not have any reason to dispute that Plaintiff asked the PTI driver to pull over three (3) times and did not get a response, or that Plaintiff asked the driver three (3) times where he was taking Plaintiff, and again did not get a response. (*id.* at 16, 55).

40.     Mr. Grace, the person that with Mr. Myrick's recommendation decided to terminate Plaintiff, agrees that results of Defendant's investigation reveal that the driver was taking a different route not usually favored by crews, and that Plaintiff asked the driver to pull over, and the driver failed to respond. (Grace dep., Ex. 5, pp. 23, 32, 35, 59).

41.     One of the reasons Mr. Grace speaks with the hearing officer is because part of the hearing officer's role is to determine what he believes to be the veracity of the statements made by those providing testimony. (Ex. 5, Grace depo., p. 56).

Mr. Myrick, the hearing officer, however did not draw any conclusions regarding Plaintiff's credibility during the course of the investigation hearing. (Ex. 8, Myrick depo., pp. 16, 62-63).

42.     Mr. Evan's is Defendant's former vice president of transportation. (Ex. 11, Evans' depo., p. 16). When presented with a fact situation similar to Plaintiff's, Mr. Evans recommended that the employee have the driver stop the vehicle, or use the company radio to contact supervision. (Ex. 11, Evans' depo., pp. 42-47).  Mr. Grace admits that Plaintiff, when confronted with the PTI driver, took the steps recommended by Mr. Evans. (Ex. 5, Grace depo., pp. 51-55).

43.     According to the Public Law Board which reinstated Plaintiff, the circumstances did not justify Complainant's termination. (Ex. 10, PLB Award).

44.     The race of the first person who performed the job Plaintiff was working on April 21, 2017 was White. (Ex. 12, Defendant's Answer to Interrogatory No. 16).

## **LAW AND ARGUMENT**

**I.     Resolution Of Plaintiff's Race Discrimination Claims Does Not Require Interpretation Of The Collective Bargaining Agreement, So The Claims Are Not Precluded By The Railway Labor Act.**

Pursuant to the Railway Labor Act "(RLA") the National Railroad Adjustment Board has exclusive jurisdiction over minor disputes concerning controversies relating to the collective bargaining agreement ("CBA") governing

Plaintiff's employment. *Stanley v. ExpressJet Airlines, Inc.*, 356 F.Supp.3d 667 (E.D. Mich. 2018). "The Sixth Circuit has enunciated a two-step test for determining whether a claim is preempted under the RLA: (1) does proof of the plaintiff's claim require interpretation of the CBA; and (2) is the right claimed by plaintiff created by the CBA or by state or federal law. (citation omitted). If the claim is not a purely factual question about …an employer's conduct and motives and cannot be decided without interpretation of the CBA, it is preempted. (citation and internal quotation marks omitted). *id.* at 684-685. Plaintiff's race discrimination claims do not require interpretation of the CBA, so they are not precluded by the RLA.

Specifically, Plaintiff's race discrimination claims are that: 1) Defendant discriminated against him by providing more opportunities for higher paying assignment to non-African Americans, and 2) that Defendant terminated Plaintiff due to his race. (Complaint, Ex. 13, ¶¶ 38, 55). With respect to the first claim, it may be necessary to refer to the CBA to determine what opportunities were available and how they were to be assigned, and insofar as the second claim, to refer to the CBA provisions regarding discipline, but "the fact that a collective bargaining agreement might be consulted in resolving a plaintiff's claims is insufficient to trigger RLA preclusion." *id*. at 687 (citing *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 833 (7th Cir. 2014). Plaintiff is not disputing the CBA language itself or how it is to be interpreted. Rather, the dispute lies with the manner in which Defendant was

dispensing the assignments and Defendant's motives and the sufficiency of Defendant's asserted grounds for Plaintiff's termination. Because Plaintiff's claims do not require interpretation of the CBA, they are not precluded by the RLA.

## II.     The Evidence Is Sufficient To Establish A *Prima Facie* Case Of Discrimination.

A *prima facie* case of discrimination requires that Plaintiff demonstrate that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." (citation omitted). *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

Defendant submits that Plaintiff cannot establish the fourth element. Plaintiff, though, was in fact was replaced by someone outside the protected class. Plaintiff is African-American. (Elium dep., Ex. 3, p. 38-39; Ex. 3 to Elium dep., Ex. 8, NS2818). He was replaced by a Caucasian – someone outside the protected class. (Defendant's Answer to Interrogatory No. 16, Ex. 12). Additionally, regarding Plaintiff's claim of discrimination related to the higher paying assignments such as deadheads, deadhead homes, and held-aways going to Caucasians, while working as a conductor in the D/T Pool for Defendant from August 2016 through April 2017, based on his personal observations of Defendant's computer screens identifying them, Plaintiff personally observed that deadheads, deadheads home, and/or held-aways, were mostly called

when the non-African American – caucasion – employees were positioned on the list ahead of him or after he was called for standard work, so that the assignments would go to them, the non-African Americans/Caucasions instead of Plaintiff, an African American. (*Yelder* Decl., Ex. 1, ¶¶ 18, 19). Contrary to Defendant's assertions, Plaintiff can prove the fourth element and therefore establish a *prima facie* case of race discrimination.

### III.   The Evidence Is Sufficient To Establish A *Prima Facie* Case of Causation For Plaintiff's Retaliation Claim.

Defendant submits that Plaintiff's retaliation claim fails because he cannot establish "but for" causation. With respect to establishing causation in a retaliation claim, the Sixth Circuit states that "at the *prima facie* stage, the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." (citation omitted). One way by which a Plaintiff can demonstrate a causal connection is to show close temporal proximity between the adverse employment actions and the protected activity. (citation omitted)…[I]f there is a very close temporal proximity, then no other evidence is needed." (internal quotation marks omitted). *Taylor v. Geithner,* 703 F.3d 328, 339 (6th Cir. 2013). "[T]his Court has typically found the causal connection element satisfied only where the adverse employment action

occurred within a matter of months, or less, of the protected activity." (citation omitted). *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339 (6th Cir. 2012).

The case of *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555 (6th Cir. 2004) is pertinent to this analysis. In *Singfield* the plaintiff argued that temporal proximity of just over three (3) months was sufficient for the Court to infer a retaliatory motive. The Court agreed, "and conclude[ed] that the temporal proximity of these events is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying Singfield's burden of demonstrating a prima facie case." (citation omitted). (*id*. at 563).

In the case *sub judice*, Plaintiff made his complaint of discrimination to Mr. Grace on March 15, 2017. (*Yelder* dep., Ex. 4, pp. 41-42; Grace dep., Ex. 5, p. 8). Mr. Grace then made the decision to terminate Plaintiff. (Grace dep., Ex. 5, p. 32). Plaintiff was notified of his termination by letter dated June 12, 2017. (Myrick dep., Ex. 8, pp. 76-77). This results in temporal proximity of just *under* three (3) months, so in accordance with the above authority it is sufficient for this Court to infer causation such that Plaintiff has established his *prima facie* case of retaliation.

**IV.  Plaintiff Can Prove That Defendant's Termination Reason Was Pretextual.**

"Pretext may be shown…indirectly by showing that the employer's proffered explanation is unworthy of credence (citation omitted)…We have rejected the Seventh Circuit's bare honest belief doctrine and instead have adopted a modified

honest-belief approach (citation omitted)…Under this approach, for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made (citation omitted)…[W]hen the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process unworthy of credence, then any reliance placed by the employer in such a process cannot be said to be honestly held. (citation omitted). (internal quotation marks omitted). *Wright, supra.* at 707-708.

The record herein is replete with examples establishing that Defendant failed to make a reasonably informed and considered decision before unjustly firing Plaintiff:

1.  Mr. Siffre, the individual that was in charge of the investigation of the incident and participated in the decision to charge Plaintiff for his actions, told Plaintiff that he, Plaintiff, acted in self-defense. (Siffre dep., Ex., 7, pp. 25, 27-29; *Yelder* dep., Ex. 4, p. 118).

2.  According to Mr. Grace, the ultimate decision maker, it was reasonable for Plaintiff to be concerned with the safety of himself and his engineer after the PTI driver did not respond when asked three (3) times where they were going and to stop the vehicle and pull over. (Grace dep., Ex. 5, 32, 55).

3.  Mr. Myrick, the hearing officer, testifies that Plaintiff should have felt safe even though it is about 10:30 PM, Plaintiff is in a PTI cab with a strange driver, Plaintiff believes the driver is taking an unusual route,

Plaintiff asks the driver three (3) times where he's taking him and gets no response, and also asks the driver to pull over three (3) times and does not get a response. (Myrick dep., Ex. 8, pp. 55-56).

4.   On their way out after the hearing Mr. Myrick told Plaintiff that he, Mr. Myrick, thought it was going to go in Plaintiff's favor because Plaintiff did really well in the hearing. (*Yelder* dep., Ex. 4, p. 133). Also that very day following the hearing Mr. Myrick spoke with Mr. Grace, stating that he thought it was going to be a dismissal. (Myrick dep., Ex. 8, pp. 75-76).

5.   Mr. Siffre was Plaintiff's direct supervisor from January 23, 2017 until Plaintiff's termination. Mr. Siffre testifies that he does not recall having any problems, issues, difficulty, anything at all with Plaintiff prior to April 21, 2017. Up to April 21, 2017 Plaintiff was performing his job to Mr. Siffre's satisfaction; up to Mr. Siffre's expectations and meeting them. (Siffre dep., Ex. 7, pp. 12-13).

6.   Mr. Siffre was in charge of Defendant's investigation into the April 21, 2017 events and the charging officer for the investigation hearing, yet prior to his June 20, 2019 deposition never saw the chain of emails from PTI regarding the April 21, 2017 incident, which emails were, according to Mr. Grace, part of the investigation into Plaintiff's April 21, 2017 incident. (Siffre dep., Ex. 7, pp. 25, 27, 47-48, Ex. 2 to Ex. 7; Grace dep., Ex. 5, p. 21, Ex. 3 to Ex. 5).

7.   According to Mr. Gaines, Defendant's § 18.64(b)(6) representative, Plaintiff's PTI driver did not have an assigned route. (Ex. 9, Gaines' depo., pp. 7, 33). Pursuant to Mr. Grace, from what Mr. Simon gathered from speaking with PTI's branch manager, the driver did have an assigned route from which he deviated. (Grace dep., Ex. 5, pp. 18-20).

8.   Mr. Gaines, Defendant's § 18.64(b)(6) representative selected by Defendant to testify as to "Defendant's investigation into the April 21, 2017 incident involving Plaintiff and a PTI driver", never saw the series of emails from PTI regarding the April 21, 2017 event which are a part of Defendant's investigation into the incident, before his March 7, 2019 deposition. (Gaines dep., Ex. 9, pp. 7, 9-10, 37-38; Exs. 2 and 6 to Gaines dep., Ex. 9; Grace dep., Ex. 5, p. 21, Ex. 3 to Grace dep., Ex. 5).

21

9.    The Public Law Board has ordered that Respondent reinstate Complainant. According to the Public Law Board, the circumstances did not justify Complainant's termination. (PLB Award, Ex. 10).

10.   According to Mr. Grace, one of the reasons he speaks with the hearing officer is because part of the hearing officer's role is to determine what he believes to be the veracity of the statements made by those providing testimony. (Grace dep., Ex. 5, p. 56). Pursuant to Mr. Myrick, the hearing officer, he did not draw any conclusions regarding Plaintiff's credibility during the course of the investigation hearing. (Myrick dep., Ex. 8, pp. 16, 62-63).

11.   Mr. Siffre, the investigating and charging officer testifies that he does not dispute that the driver did not take the preferred route, or that Plaintiff asked the driver where he was taking him and to stop, and did not receive a response from the driver. (Siffre dep., Ex.7, pp. 25, 27, 71-72).

12.   Mr. Myrick, the investigation hearing officer that recommended dismissal, admits that he does not have any reason to dispute that Plaintiff asked the PTI driver to pull over three (3) times and did not get a response, or that Plaintiff asked the driver three (3) times where he was taking Plaintiff, and again did not get a response. (Myrick dep., Ex. 8, pp. 16, 55).

13.   Mr. Grace, the person that with Mr. Myrick's recommendation decided to terminate Plaintiff, agrees that results of Defendant's investigation reveal that the driver was taking a different route not usually favored by crews, and that Plaintiff asked the driver to pull over, and the driver failed to respond. (Grace dep., Ex. 5, pp. 23, 32, 35, 59).

14.   When presented by a fact situation similar to Plaintiff's, Mr. Evans, Defendant's then vice president of transportation, recommended that the employee have the driver stop the vehicle, or use the company radio to contact supervision. (Evans dep., Ex. 11, pp. 16, 42-47).  Mr. Grace admits that Plaintiff took the steps recommended by Mr. Evans when confronted with the PTI driver. (Grace dep., Ex 5, pp. 51-55).

Pursuant to the foregoing: 1) the individual in charge of the investigation and that charged Plaintiff with the violation told Plaintiff that it was self-defense; 2) the ultimate decision maker agrees that it was reasonable for Plaintiff to be concerned with his safety; 3) the hearing officer that recommended dismissal incredulously states that Plaintiff should have felt safe; 4) on their way out of the hearing the hearing officer told Plaintiff that he thought it went in Plaintiff's favor because he did well in the hearing, and then later that day calls Mr. Grace stating that he thought it was going to be a dismissal; 5) according to Plaintiff's direct supervisor, prior to April 21, 2017 Plaintiff was performing to his satisfaction and meeting his expectations; 6) the individual in charge of Defendant's investigation and that charged Plaintiff with the rule violation never saw the PTI investigation emails which are part of Defendant's investigation until he was deposed on June 20, 2019, over two (2) years after the hearing; 7) according to Defendant's corporate representative the driver did not have an assigned route, while pursuant to Mr. Grace PTI advised that the driver did have an assigned route; 8) Defendant's corporate representative designated to provide testimony regarding Defendant's investigation did not see the PTI investigation emails which are part of Defendant's investigation until his March 7, 2019 deposition, nearly two (2) years after the hearing; 9) the PLB has reinstated Plaintiff, finding that the circumstances did not justify termination; 10) according to Mr. Grace he speaks to the hearing officer because the officer

determines the veracity of the hearing testimony, but the hearing officer herein states that he did not draw any conclusions regarding Plaintiff's veracity; (11) the person in charge of the investigation and that charged Plaintiff with the rule violation does not dispute that the driver did not take the preferred route, or that Plaintiff asked the driver where he was taking him and to stop, and did not receive a response from the driver; 12) the ultimate decision maker, agrees that the results of Defendant's investigation reveal that the driver was taking a different route not usually favored by crews, and that Plaintiff asked the driver to pull over, and the driver failed to respond; and 13) Mr. Grace admits that during the event Plaintiff took the steps recommended by Defendant's then vice president of transportation. All of this is indisputable evidence that Defendant clearly did not make a reasonably informed and considered decision, so its proffered reason for Plaintiff's termination is not worthy of credence, and instead is pretextual.

## V.    CONCLUSION

Resolution of Plaintiff's discrimination claims does not require interpretation of the CBA, so the claims are not precluded by the RLA. Plaintiff can establish that he was replaced by a someone outside the protected class and that he was treated differently than similarly situated employees, so he can present a *prima facie* case of discrimination. Plaintiff can also establish causation sufficient to prove a *prima facie* case of retaliation, and that Defendant's purported reason for Plaintiff's

termination is pretextual. Accordingly, Defendant's Motion for Summary Judgment should be denied.

HOLLAND LAW FIRM,


 */s/ Carl Kessinger*
Carl Kessinger
Holland Law Firm, LLC
300 N. Tucker, Suite 801
St. Louis, MO 63101
314-241-8111
314-241-5554 – Facsimile
***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2019, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to each attorney or party of record herein by electronic means.


 */s/ Carl Kessinger*