UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JEROME YELDER**, | 2:18-CV-10576-TGB |
| Plaintiff, | |
| vs. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **NORFOLK SOUTHERN RAILWAY COMPANY**, | |
| Defendant. | |

Plaintiff Jerome Yelder, an African American train conductor, brings this lawsuit against his employer, Defendant Norfolk Southern Railway Company ("Norfolk Southern"), alleging racial discrimination in the workplace and retaliatory termination. Yelder complains that he was assigned lower-paying assignments than his white counterparts and that, after he complained, he was unfairly terminated following an altercation with a taxi driver.

Yelder's claims are under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., ("Title VII") and 42 U.S.C. § 1981. Norfolk Southern has moved for summary judgment. Norfolk Southern says that Yelder's race discrimination claims are preempted by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-188, and alternatively that he has failed to

establish a prima facie case of race discrimination. As for Yelder's retaliation claims, Norfolk Southern argues that the cause of his termination was the taxi-cab altercation, and it was not a pretext for discrimination. Yelder's termination was later reversed, and he remains an employee of Defendant.  After carefully reviewing the factual record and the legal arguments of the parties, the Court concludes that Defendant's motion is well-taken, so the motion for summary judgment will be **GRANTED**.

## I. Facts and Procedural History

Yelder began working as a conductor for Norfolk Southern in 2011. In August of 2016 he was assigned to the Detroit/Toledo ("DT") pool, operating trains to and from Detroit and Toledo, working in two-member crews consisting of a conductor and an engineer. Members of the DT pool included both regularly scheduled members and "extra board" members; extra board members filled vacancies or extra work when there were not enough regularly scheduled members to complete an assignment. Elium Deposition, ECF No. 27-4, PageID.1686. Yelder was a regularly scheduled member of the DT pool. A union represented Yelder and a Collective Bargaining Agreement ("CBA") governed the terms and conditions of his employment.

Under the provisions of the CBA, employees who join the DT pool are assigned jobs through a "first-in/first-out" process.[1] Defendant describes the "first-in/first-out" process as follows: after a crew completes an assignment, they go to the bottom of available crews that may be called for an assignment (sometimes called a "turn"). As crews on the list are called, each crew moves up the list until they become the next available crew for a new assignment. Elium Deposition, ECF No. 27-4, PageID.1695. Yelder agrees this is how the first-in first-out process is supposed to work. Yelder Deposition, ECF No. 24-3, PageID.165. Crews receive assignments through a "crew call" where a call center notified the individual crews of an upcoming trip. ECF No. 24-3, PageID.161. Crew callers were usually located in Atlanta, Georgia but could also be chief crew dispatchers locally stationed in Dearborn, Michigan. *Id.* at PageID.162. Defendant asserts that crews are called by crew numbers and not by the names of the individual crew member, while Yelder says that crews are called by name.

Once a crew in the DT pool is on an assignment, there are several ways that the trip can develop that the railroad uses specialized terms to describe. The crew may need to "deadhead turn," "deadhead home" or they may need to be "held-away." When a crew "deadhead turns," they

---

[1] Article 11, Section 5 of the CBA provides that "[c]rews holding positions in pool or unassigned service will run or deadhead first-in first-out, except as otherwise provided." ECF No. 24-4, PageID.625.

3

take a taxi or another mode of transportation from their "departing terminal" to another destination in order to meet the train for the return trip. ECF No. 24-3, PageID.172. For example, a crew stationed in Michigan would take a taxi to Toledo to join a train and conduct it back to Michigan. When a crew is "held-away," they stay in a hotel or other lodging because they are staying away from their "home terminal." *Id.* at PageID.173. When a crew "deadheads home," this describes the situation where a crew is waiting at the distant terminal for an assignment but because there is no train, the crew is ordered to return home by taxi and Norfolk Southern pays for their transportation. These work conditions are defined and described in the CBA, and the CBA also governs the applicable compensation. *See* Relevant CBA Provisions, ECF 24-4, PageID.625-26, 692-705, 711-14, 741-43 (Articles 11, 24, 25, 26, 30, 34). The CBA also governs Norfolk Southern's seniority system, which is used to assign these jobs. ECF 24-4, PageID.580 (Article 4). Yelder claims that deadheading and held-away opportunities result in higher pay, ECF No. 27-2, PageID.1676, which Defendant does not contest. With regard to the DT pool, Norfolk Southern contracts with Professional Transport, Inc. ("PTI"), an independent taxi service, to transport crews that are doing a "deadhead turn" or "deadhead home." Gaines Declaration, ECF No. 24-2.

## A. Discrimination complaint

On March 15, 2017, Yelder sent an email to a division manager of Norfolk Southern, Michael Grace, in which he expressed a complaint that

he was being discriminated against because of his race. ECF No. 24-3, PageID.311-12. Yelder contended that he was receiving far fewer deadhead and held-way opportunities than his white counterparts and pointed out that he was the only regularly scheduled African American conductor in the DT pool. ECF No. 24-3.[2] Yelder claimed that the deadhead/held-away assignments result in higher pay and were frequently being called once white employees were ahead of him on the list or immediately after he was called for a traditional assignment, so the deadhead/held-away assignments would go to white employees rather than to him. He believed white employees were receiving these assignments even though he had superior attendance records. ECF No. 24-3, PageID.174; *id.* at PageID.57 ("[I]t didn't matter what time, the pattern was unless there was some type of event where they absolutely needed someone to deadhead down, I just wasn't called to deadhead. They would call two of my colleagues ahead of me to deadhead then call me for a train and then maybe one or two behind me for the deadhead and that became consistent."). As a result, Plaintiff alleges that these conductors were making more money than he was, even though Plaintiff had superior attendance records. *Id.* The email also stated that Yelder had

---

[2] In deposition, Yelder stated that he also complained of racial discrimination to his union representative, Nicholas Greficz, in February of 2017. ECF No. 24-3, PageID.150-51. His union representative told him that he would have to speak with railroad management. *Id.* Yelder first spoke with his direct supervisor, Courtney Siffre, over the phone. *Id.* Siffre said he would investigate, but Yelder says he never heard back from Siffre, so he directly contacted Michael Grace. *Id.* at PageID.154.

spoken with other African American employees who at some point held the DT pool and was told they did not like holding the DT pool because they also experienced fewer deadhead and held-away opportunities. *Id.*[3]

In response to Yelder's email, Norfolk Southern conducted an investigation that included comparing the earnings and deadheading opportunities of Plaintiff with other members of the DT pool. Susan Decker, a Human Resources EEO officer for Norfolk Southern, created and reviewed data sheets,  and concluded that from August 2016 (when Plaintiff joined the DT pool) to March 2017 (when Plaintiff made the complaint), Yelder was in the top 10 employees in the DT pool for deadheading trips (he had 32 deadheading trips) and that Yelder was the third-highest earner in the DT pool out of 42 employees. ECF No. 24-7.[4] Based on Decker's data and analysis, Defendant concluded that Plaintiff's complaint was unsubstantiated and so notified Plaintiff on April 6, 2017. *Id.*

---

[3] Yelder discussed these conversations and named each individual African American employee during his deposition. *See* ECF No. 24-3, PageID.178. However, the record does not contain depositions or affidavits from any of these individuals.

[4] Neither this report, nor Defendant's motion, attempts to explain why these findings do not conflict with Yelder's position that there were only nine or ten *regularly scheduled conductors* in the DT pool and that he was the only African American regularly scheduled conductor. *See* Yelder's Deposition, ECF No. 24-3, PageID.177, 193-94. Nor does Defendant address how its findings would change if the data was analyzed by comparing Yelder to regularly scheduled conductors only.

### B. Physical altercation with PTI taxi driver

Approximately three weeks later, on the evening of April 21, 2017, after completing an assignment in Ohio, Yelder and Norfolk Southern engineer James Jackwak took a PTI taxi van from the Toledo rail yard to a hotel. Yelder's Written Statement, ECF No. 24-3, PageID.313-14. This was a held-away trip. Yelder sat in the front passenger seat next to the driver and Jackwak sat in the rear passenger seat behind the driver. Shortly after the ride began, Yelder claims he noticed the driver was taking an alternate route to the hotel. *Id.* Yelder claims he had made this very drive to the hotel a few times and knew the usual route. *Id.* Yelder says he asked the driver three times whether he was taking them to the hotel and each time the driver refused to respond. *Id.* Yelder then picked up the microphone in the taxi van and called the Maumee River Bridge operator and told her that the van was going in the opposite direction of the hotel. Yelder Deposition, ECF No. 24-3, PageID.206.

Yelder then dropped the microphone and attempted to stop the van by grabbing the steering wheel with his hands and using his leg to push the break. *Id.* The driver pushed Yelder back into his seat and blocked Yelder's hands and legs. Yelder then tried to remove the key from the ignition but the driver again knocked Yelder's hand out of the way. *Id.* Yelder then "struck" the driver in the chest with his hand.[5] ECF No. 24-

---

[5] On summary judgment, Yelder disputes that he "struck" the driver in the chest, ECF No. 27, PageID.1646, because in deposition he only stated that "perhaps" he

3, PageID.313. The taxi driver eventually stopped the vehicle and Yelder and Jackwak exited. The driver left the scene and another driver in the area arrived to transport Yelder and Jackwak to the hotel. Jerry Simon, trainmaster and Norfolk Southern's supervisor who spoke with Yelder at the hotel that evening, immediately removed Yelder from service pending an investigation of the incident.  ECF No. 24-5, PageID.1030.

After an investigation, Norfolk Southern charged Yelder with conduct unbecoming an employee for striking the driver. Yelder, Jackwak, and others testified at a hearing. Yelder confirmed that he struck the taxi driver in the chest but said that he only acted the way he did to protect himself and Jackwak because he believed the driver was not driving them to the hotel. The driver could not be located and did not provide an interview to Norfolk Southern or testify at the hearing. Hearing Transcript, ECF No. 24-5, PageID.1037-1129.

Following the hearing, Norfolk Southern terminated Yelder on June 12, 2017. ECF No. 24-3. However, on January 2, 2019, after Yelder filed suit, the Public Law Board reinstated Yelder (without pay for lost time). ECF No. 24-11. The Board concluded that even though there was substantial evidence to support the charge, Yelder should be reinstated because of his tenure and discipline record. *Id.* Yelder returned to work.

---

"touched his chest. I do believe that." ECF No. 25-7, PageID.1729. However, in Plaintiff's own handwritten statement following the incident, he stated that he "struck" the driver in the chest. *See* ECF No. 24-3, PageID.313. Yelder conceded as much at oral argument.

Yelder filed a charge with the Equal Employment Opportunity Commission ("EEOC") claiming racial discrimination and retaliation by Norfolk Southern. The EEOC issued Yelder a right-to-sue letter and Yelder filed a complaint on these grounds. Norfolk Southern now moves for summary judgment on each of Yelder's claims. The motion was fully briefed, and the Court heard oral argument on November 25, 2019.

## II. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party

opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## III. Analysis

### A. Racial Discrimination Claims (Counts I and III)

#### 1. RLA Preclusion

"The Railway Labor Act ("RLA") governs disputes between management and labor in the railroad industry." *Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 785 (6th Cir. 2012). It divides disputes into two categories: major and minor. *Id.* Major disputes "relate to the formation of collective [bargaining] agreements or efforts to secure them" and concern "rates of pay, rules or working conditions." *Stanley v. ExpressJet Airlines, Inc.*, 356 F.Supp.3d 667, 683 (E.D. Mich. 2018) (quoting *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994)).

Minor disputes on the other hand "gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." *Id.* They "involve controversies over the meaning of an existing collective bargaining agreement." *Id.* The RLA also provides for a mandatory arbitration mechanism designed to settle disputes quickly. *Emswiler*, 691 F.3d at 785 (citing 45 U.S.C. § 151a; *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994)). Minor disputes must initially be settled through grievance procedures set out in a CBA. *Id.* If parties are unsuccessful at resolving the minor dispute, it is submitted to binding arbitration. *Id.* Only after a final decision by the arbiter may an employee then file a claim with a district court. *Id.* If an employee fails to utilize this RLA-mandated arbitral process to settle her minor dispute, the RLA "clearly precludes federal courts from granting relief." *Id.* at 789.[6]

Norfolk Southern asserts here that Yelder's race discrimination claims are "minor disputes" subject to mandatory arbitration and thus are precluded by the RLA. ECF No. 24, PageID.113-117. For Yelder's race discrimination claims to be precluded by the RLA their resolution must "depend[ ] on an interpretation of the CBA." *Emswiler*, 691 F.3d at 792.

---

[6] Other circuits hold that because the National Railroad Adjustment Board has "exclusive jurisdiction" over "minor disputes," the district court lacks subject matter jurisdiction over those claims. *See Brown v. Illinois Central R.R. Co.*, 254 F.3d 654, 668 (7th Cir. 2001). The Sixth Circuit does not take that approach. *Emswiler*, 691 F.3d at 789.

The Sixth Circuit utilizes a two-part test to make this determination: "(1) does proof of the plaintiff's claim require interpretation of the CBA; and (2) is the right claimed by plaintiff created by the CBA or by state or federal law." *Stanley*, 356 F.Supp.2d at 684-85.[7]  "If the 'claim is not a purely factual question about . . . an employer's conduct and motives and cannot be decided without interpretation of the CBA,' it is preempted." *Id.* at 685 (quoting *Emswiler*, 691 F.3d at 792).[8] "Additionally, the bare fact that the CBA will be consulted in the course of evaluating Plaintiff's claim does not require RLA pre-emption." *Smith v. Northwest Airlines, Inc.*, 141 F.Supp.2d 936, 945 (W.D. Tenn. 2001) (citing *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994)); *Stephens v. Norfolk & W. Ry. Co.*,

[7] The Sixth Circuit has yet to squarely address the question of whether Title VII claims will survive RLA preclusion simply because they are federal statutory claims. Some Circuit courts of appeal have held that claims arising under a federal statute survive RLA preclusion. *See Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1115 (8th Cir. 1995) (holding that plaintiff's ADA claim was not preempted by the RLA because plaintiff "seeks to enforce a federal statutory right, not a contractual right embodied by the collective bargaining agreement"); *Felt v. Atchison, Topeka & Santa Fe Ry. Co.*, 60 F.3d 1416, 1419-20 (9th Cir. 1995) (concluding that Title VII disputes are not precluded by the RLA absent "express agreement to arbitrate Title VII disputes" in the CBA). And the key Sixth Circuit decision, *Emswiler*, dealt with a plaintiff bringing a disability discrimination claim arising under Ohio state law, not federal law. *Emswiler*, 691 F.3d at 792. Both the Seventh Circuit Court of Appeals, and another judge in this district, have applied the rule in *Emswiler* to a Plaintiff's claims arising under federal law. *Brown v. Illinois Central R.R. Co.*, 254 F.3d 654, 668 (7th Cir. 2001) (applying the "interpretation" test to a plaintiff's Americans with Disabilities Act claim); *Stanley v. ExpressJet Airlines, Inc.*, 356 F.Supp.3d 667, 685 (E.D. Mich. 2018) (applying *Emswiler* to the plaintiff's Title VII claim). This Court will likewise apply *Emswiler* to Plaintiff's Title VII and § 1981 claims.

[8] The Sixth Circuit recognizes exceptions to the RLA arbitral requirement once a claim is found to be a "minor dispute." *Emswiler v. CSX Transp. Inc.*, 691 F.3d 782, 790 (6th Cir. 2012). Yelder does not invoke any of these exceptions.

792 F.2d 576, 581 n.8 (6th Cir. 1986) ("[I]ncidential intrusion into interpreting the collective bargaining agreement necessitated by recognizing this separate cause of action does not require plaintiffs to pursue union grievance procedures prior to bringing the ADEA claim."). The Court must therefore address the question of whether Yelder's race discrimination claims require this Court to *interpret* the CBA claims, or whether the CBA will be merely *consulted* in reaching that decision.

Plaintiff's two race discrimination claims are that: (1) "Defendant discriminated against him by providing more opportunities for higher paying assignments to non-African Americans" and (2) "Defendant terminated Plaintiff due to his race." ECF No. 27, PageID.1660. As for his first claim, Plaintiff essentially asserts that while the CBA lays out a first-in, first-out procedure for assigning deadheading (and therefore higher paying) opportunities, Defendant circumvents that process in a racially discriminatory manner against him. He claims that it may be necessary for the Court to "refer" to the CBA to determine what the assignment opportunities were and how assignments were made, but the Court will not have to "interpret" the CBA because both parties do not dispute the CBA's accepted process for handing out assignments. *Id.* In other words, he does not claim that the CBA provisions themselves are racially discriminatory or that their meaning is somehow in need of explication. As for his second claim, Plaintiff asserts that while it may be necessary for the Court to consult or refer to the CBA's procedure for

discipline, the Court will not have to interpret the CBA because he does not challenge the CBA's disciplinary procedure as racially discriminatory, nor does he claim that the validity of his termination turns on a particular understanding or interpretation of that procedure. *Id.*

Plaintiff relies on *Stanley v. Express Jet Airlines, Inc.*, an Eastern District of Michigan case that recently considered whether a plaintiff's religious discrimination claim under Title VII was precluded by the RLA. 356 F.Supp.3d 667 (E.D. Mich. 2018), *appeal docketed*, No. 19-1034 (6th Cir. Jan. 7, 2019). In *Stanley*, the plaintiff, a flight attendant practicing the Muslim faith, sought an accommodation so that she would not be required to serve alcoholic beverages on flights. *Id.* at 673. After the plaintiff was unable to come to an informal agreement with her co-workers, the plaintiff was placed on a year-long non-disciplinary, unpaid administrative leave of absence to let her seek another position in the company. She brought a Title VII failure to accommodate claim. *Id.* at 683. On summary judgment, Express Jet argued the plaintiff's failure to accommodate claim required interpretation of the plaintiff's CBA, and therefore it was a "minor dispute" precluded by the RLA. *Id.* at 684. The court agreed. *Id.* at 691.

The court looked to provisions of the CBA which stated that senior flight attendants had the choice to assume the "A" or "B" flight attendant position. It also looked to Express Jet's flight attendant manual, which

stated that flight attendant "B" should assist flight attendant "A" with serving alcohol. The court found that the plaintiff's Title VII claim required CBA interpretation because the court would have to consider the extent to which her requested accommodation violated the CBA's seniority provisions or adversely affected the seniority rights of other flight attendants by mandating her control over the two positions. If her accommodation violated the CBA's seniority provisions, then Express Jet could prove that the accommodation was an "undue hardship" under Title VII. *Id.* at 692. In such a case, the employer-defendant is not merely invoking compliance with CBA to justify its practice as non-discriminatory. *Id.* at 687-88 (quoting *Rabe v. United Air Lines Inc.*, 636 F.3d 866, 873 (7th Cir. 2011) ("The [CBA] is relevant to Rabe's claims because she alleged that the travel-voucher policy was enforced against her in a discriminatory manner, but her claims do not call the policy itself into dispute.")). Rather, if it was shown that the plaintiff's requested accommodation violated the CBA, Sixth Circuit precedent held that such an accommodation was an "undue hardship;" CBA interpretation would dispose of the plaintiff's case. Thus, her claim was precluded by the RLA.

The court in *Stanley* looked to opinions from the Fifth and Seventh Circuits to explain that "a claim is not barred simply because the action challenged by the plaintiff is arguably justified by the terms of the CBA." 356 F.Supp.3d at 687 (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 833 (7th Cir. 2014)). And "[a]n 'employer cannot ensure the

15

preclusion of a plaintiff's claim merely by asserting CBA-based defenses to what is essentially a non-CBA-based claim." *Carlson*, 758 F.3d at 833 (quoting *Brown v. Illinois Central R.R. Co.*, 254 F.3d 654, 668 (7th Cir. 2001)).

The Seventh Circuit also explained this distinction in *Rabe v. United Air Lines Inc.*, 636 F.3d 866, 873 (7th Cir. 2011). In *Rabe*, the plaintiff alleged that her supervisor made anti-gay comments to her and suspected that she was a lesbian. *Id.* at 868. That supervisor investigated, and later terminated, the plaintiff for misusing travel vouchers, which the plaintiff claimed was a pretext for firing her because she was a lesbian. *Id.* The plaintiff also claimed that she was treated differently than similarly situated employees who used travel vouchers in a similar manner. *Id.* The Seventh Circuit concluded that the "principle focus" of the plaintiff's claims was on the defendants' "subjective reasons for terminating Rabe's employment" rather than an interpretation of the CBA. *Id.* at 873. Concluding that the plaintiff's claims were not preempted or precluded by the RLA, the Seventh Circuit distinguished those cases where an employer's compliance with the CBA was dispositive of the plaintiff's claim. *Id.* at 473. For example, in *Brown v. Illinois Central Railroad Company*, the Seventh Circuit found RLA preclusion for an ADA accommodation claim where circuit precedent established that the ADA did not require accommodation by sacrificing collectively bargained, bona fide seniority rights of other employees. 254

16

F.3d at 668 & n.14. If the employer could prove that its actions complied with the CBA's seniority provisions, the plaintiff's ADA claim was not meritorious. *Id.*

The court of appeals compared Rabe's claims to those of a male flight attendant considered by the Fifth Circuit in *Carmona v. Southwest Airlines, Co.*, 536 F.3d 344 (5th Cir. 2008). In *Carmona*, the plaintiff had alleged that unexcused absences by female flight attendants went unpunished, that his supervisors made discriminatory remarks against male employees, and that his chronic illnesses were the real reason he was fired. *Id.* at 345-46. The Fifth Circuit concluded that a plaintiff's claims are not preempted where it is alleged that the CBA has been applied to the plaintiff in a discriminatory manner, as opposed to where a challenge is made to the CBA itself or its procedures. *Rabe*, 636 F.3d at 873 (citing *Carmona v. Southwest Airlines, Co.*, 536 F.3d 344, 349-50 (5th Cir. 2008)).

Here, Plaintiff's race discrimination claims more closely resemble those in *Rabe* and *Carmona* than those in *Stanley* and *Brown*. Yelder claims that Norfolk Southern circumvented the first-in first-out procedures of the CBA; he does not challenge the "meaning" of the first-in first-out procedure or how it operates. *Carmona*, 536 F.3d at 349 ("He alleges that CBA procedures were *applied* in a discriminatory manner, not that CBA procedures were fundamentally discriminatory."). Yelder also claims that Norfolk Southern circumvented its disciplinary

procedures by challenging the sufficiency of Defendant's asserted grounds for terminating Plaintiff. Norfolk Southern rebuts these claims only by listing provisions of the CBA dealing with the first-in, first-out process, deadheading, hold-aways, and discipline[9] and asserting that these provisions will require interpretation by the Court. Norfolk Southern does not argue, and offers no authority for the proposition, that compliance with the CBA's first-in, first-out process and disciplinary procedure means that Plaintiff's Title VII race discrimination claims must fail. Rather, compliance could be a legitimate, non-discriminatory

---

[9] Those particular provisions cited by Defendant are:

> Article 11, Section 5: Freight Service – "Crews holding positions in pool or unassigned service will run or deadhead first-in first-out, except as otherwise provided." ECF No. 24-4, PageID.625.
>
> Article 24, Section 2: Regulations in Pool Service – "Overtime, held-away, and deadheading shall be computed and counted as mileage, unless otherwise provided." ECF No. 24-4, PageID.692.
>
> Article 25, Section 1: Deadheading – "(A.) Deadheading and service may be combined in any manner that traffic conditions require, and when so combined employees shall be paid actual miles or hours on a continuous time basis . . . However, when deadheading from the away-from-home terminal to the home terminal is combined . . . the rate paid for the basic day mileage portions of the service trip and deadhead shall be at the full basic daily rate. (B) Employees deadheading into their home terminals can have their deadhead combined with service out of that terminal only when the deadhead and service comes within the provisions of short turnout service rules." ECF No. 24-4, PageID.693.
>
> Article 30, Section 1: Held-at-Other-Than Home Terminal – "Trainmen in pool freight and in unassigned service held at other than home terminal will be paid on the minute basis for the actual time so held . . . If held 16 hours after the expiration of the first 24-hour period from the time relieved, they will be paid for the actual time so held . . . Should a trainman be called for service or ordered to deadhead after pay begins, held away from home terminal shall cease at the time pay begins for such service or deadheading . . ." ECF No. 24-4, PageID.711.

reason for disparate treatment that could be rebutted by evidence of pretext from a plaintiff.

To illustrate the difference between "interpreting" a contract and simply relying on or referring to it, a hypothetical may be useful. Suppose that a lease requires payment by the tenant on the first of the month. The plaintiff argues she paid on the first of the month while the defendant argues the plaintiff violated the lease by paying five days late. The plaintiff is not challenging the meaning of the terms "payment is due on the first of the month;" the question is whether—as a matter of fact— the plaintiff complied with the terms of the lease. In this example, determining whether the plaintiff paid her rent in compliance with the lease requires reference to the lease but not interpretation of the lease. The fact finder must consider the plaintiff's conduct under the lease to determine whether she complied with its undisputed terms. So too with Norfolk Southern's RLA preemption argument. Norfolk Southern argues it complied with the CBA, Yelder argues it did not. The factfinder in Yelder's action will have to determine whether Norfolk Southern deviated from the CBA in a manner that violated Yelder's rights under Title VII and § 1981. Therefore, "consideration of the CBA *as applied to Title VII . . .* –not interpretation of the CBA itself—is what is required to resolve [Yelder's] claims." *Carmona*, 536 F.3d 344.

In sum, while "certain provisions of the CBA must be examined and weighed as a relevant but non-dispositive factor" in deciding whether

Yelder was subject to disparate treatment or faced racially motivated termination, the fact that such consideration of the CBA is necessary does not mean that the claims are precluded by the RLA. *Brown*, 254 F.3d at 667-68; *Carmona*, 536 F.3d at 349-50.[10] Instead, Plaintiff's race discrimination claims will turn on Norfolk Southern's conduct and motives in relation to the CBA's requirements. *See Emswiler*, 691 F.3d at 793 (citing *Norris*, 512 U.S. at 261). And despite Defendant's claim to the contrary, Plaintiff is asserting that Defendant violated rights created by *federal statute*—i.e., a right to be free from discrimination under Title VII—not by the CBA. *Stanley*, 356 F.Supp.2d at 684-85.

---

[10] Defendant's reliance on *Brokate v. Express Jet Airlines, Inc.*, 174 Fed.Appx. 867 (6th Cir. 2006) is not to the contrary. In *Brokate*, the plaintiff alleged that Express Jet violated the terms and conditions of the CBA by not permitting her to pay for and receive benefits as an active employee while on injury leave. *Id.* at 869. There, it was clear that if the defendant complied with the CBA, the plaintiff's claim would fail. Defendant also relies on an unpublished disposition from the Sixth Circuit, *Dotson v. Norfolk S. R.R. Co.*, which adopted in full a district court's conclusion that "[w]hether or not Plaintiff was disciplined more harshly [than other employees] or . . . should have been disciplined at all, depends upon an interpretation of the CBA regulations regarding discipline." 52 Fed.Appx. 655, 658 (6th Cir. 2002). Not only is *Dotson* unpublished and therefore not binding on this Court, it predates a number of the cases summarized above and addresses the RLA preclusion issue in a broad and conclusory fashion. *See also Moss v. Norfolk Western Ry. Co.*, No. 02-74237, 2003 WL 21817127, at *5 (E.D. Mich. July 22, 2003) (applying *Dotson* and finding that plaintiff's Title VII disparate impact claim alleging he was discharged for the same conduct that a white employee was not discharged for was precluded by the RLA because the claim depended "on an interpretation of the CBA regulations regarding discipline"); *Lee v. Norfolk Southern R.R. Co.*, 912 F.Supp.2d 375, 380 (W.D.N.C. 2012) (concluding that the plaintiff's claim that he was more severely disciplined for drinking alcohol on duty than a white employee was precluded by the RLA because it required interpretation of provisions in the CBA regarding discipline). The reasoning in these cases is less developed and fails to get to the root of the preclusion issue, i.e., whether the CBA as applied to Title VII, not interpretation of the CBA itself is required to resolve the plaintiff's claims. *Carmona*, 536 F.3d 344.

In sum, to return then to the Sixth Circuit's two-part test: "(1) does proof of the plaintiff's claim require interpretation of the CBA; and (2) is the right claimed by plaintiff created by the CBA or by state or federal law," *Stanley*, 356 F.Supp.2d at 684-85, the Court concludes that plaintiff's claim does not require interpretation of the CBA and the right claimed by plaintiff, to non-discriminatory treatment, is created by federal law rather than by the CBA. Accordingly, Plaintiff's race discrimination claims are not precluded by the RLA.

### 2. The merits of Plaintiff's Title VII and 42 U.S.C. § 1981 Race Discrimination claims

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Absent direct evidence of discrimination, to demonstrate a *prima facie* case of race discrimination under Title VII, a plaintiff must show that: "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). If the plaintiff makes a *prima facie* showing, this creates a presumption that

21

the defendant discriminated against the plaintiff and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action. *Wright*, 455 F.3d at 706. Legitimate, non-discriminatory reasons for termination are those "supported by admissible evidence, 'which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Id.* at 707 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)). If the defendant makes this showing, the presumption of discrimination falls away and the plaintiff must show that the defendant's non-discriminatory reason was a "pretext for discrimination." *Id.* But the burden of persuasion always remains with the plaintiff. *Id.* Section 1981 claims are analyzed under this framework as well. *Newman v. Federal Exp. Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).

The parties do not dispute that Yelder has adequately shown the first three elements necessary to support a *prima facie* claim. Only the fourth element of Yelder's *prima facie* race discrimination claims is at issue here, that is, whether he was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees. For Yelder's first claim that he received fewer deadheading and held-away opportunities, to prove the fourth element he must demonstrate that he was treated differently than similarly situated employees outside of the protected class. For Yelder's second claim, that he was terminated because of his race, proving the fourth

element means that he must show either that he was treated differently than similarly situated employees outside of the protected class or that he was replaced by someone outside of the protected class.

As for Yelder's first claim—that he received fewer deadheading and held-away opportunities than non-African Americans in the DT pool, and therefore unequal pay—Yelder claims that Norfolk Southern circumvented the "first-in first-out" procedures of the CBA to discriminatorily offer these opportunities to non-African American employees. Plaintiff supports this with a declaration wherein he states that he observed on Norfolk Southern computer monitors, deadheading and held-away opportunities being "mostly called" when non-African American employees were positioned on the list ahead of Plaintiff, or after Plaintiff was called for standard work, so the deadheading and held-away assignments would go to those employees. *See* ECF No. 27-2, PageID.1674-76. Defendant rebuts this with deposition testimony stating that crew callers were not aware of the names or races of the crews they were calling out and therefore could not be acting in a discriminatory manner; they were simply following the first-in, first-out process and assigning jobs to crews in the order of who had been waiting for an assignment the longest. Decker Deposition, ECF No. 24-7, PageID.1321, 1324. In response, Plaintiff declares that he viewed the computer monitors listing the names of all crew members, and that each time he was called into work, it was always by name, and by a live operator or by

automation. ECF No. 27-2, PageID.1674-76. He also stated that he was available to work more often than most of the other conductors and engineers regularly assigned to the DT pool,[11] and was not the least senior regularly assigned conductor, implying that he should have more deadheading and held-away opportunities. *Id.*

However, Plaintiff does not allege or provide evidence that the individuals calling him into work by name were also the individuals making the crew assignments. Yelder also does not allege or suggest that these "computer screens" are the same screens that the crew callers in Atlanta, Georgia saw, or that those crew callers knew of Yelder's race or the race of the other conductors in the DT pool. Indeed, while Yelder asserts that *he* could see the employee names on the computer screens and *he* knew the races of the conductors in the DT pool, Yelder does not argue that the *crew callers* knew the races of the employees to be able to call crews in a discriminatory manner. More importantly, Plaintiff has not come forward with any proof to counter Defendant's evidence that Plaintiff was in the top three earners of the DT pool; Plaintiff's response admits this fact, ECF No. 27, PageID.1646, ¶ 24, and Plaintiff's declaration does not rebut it. *See* Decker's findings, ECF No. 24-7,

---

[11] Susan Decker testified in deposition that her report did not include any analysis regarding how often Plaintiff was available to work compared with other pool members. Decker Deposition, ECF No. 24-7, PageID.1318. She also agreed that if an employee was available to work more than other employees, that employee would earn more than the others. *Id.* at PageID.1326-27.

PageID.1348-49. Plaintiff attempts to dispute Decker's data by arguing that it included "extra board" members when it should have been limited to regularly scheduled employees like Yelder. ECF No. 27, PageID.1650. Because Defendant's analysis included these "extra board" members, Plaintiff argues the data artificially inflates his earnings in comparison to non-African Americans in the DT pool who were not regularly scheduled workers. Plaintiff maintains that as a regularly scheduled worker, of course he would stand to earn more than those extra board members who worked the DT pool less frequently. *Id.*

But this critique of Decker's data does not undermine its conclusion that Plaintiff was paid more than similarly situated non-African American regularly scheduled conductors in the DT pool. This is because even if Plaintiff was only compared to the nine or 10 regularly scheduled DT conductors, he would still be in the top three earners of the DT pool and therefore earning higher pay than at least six non-African American, regularly scheduled conductors in the DT pool.

Relying on *Martinez-Gonzalez v. Lakeshore Staffing, Inc.*, 750 Fed.Appx. 463, 467 (6th Cir. 2018), Defendant contends that Decker's data is objective evidence that has not been refuted by Plaintiff, and therefore no genuine issue of material fact exists as to whether Yelder was paid in accordance with similarly situated, regularly scheduled, DT pool members. ECF No. 24, PageID.120. The Court agrees. In *Martinez-Gonzalez*, plaintiffs brought a disparate treatment claim against their

employer alleging that they did not receive regular raises and were compensated less than other similarly situated non-Hispanic employees. 750 Fed.Appx. at 464. In support of its motion for summary judgment, the employer submitted a pay rate sheet showing that the plaintiffs "were among the highest-paid of all crew employees." *Id.* at 467. Even though the plaintiffs relied on the spreadsheet to show that various other employees made more than the plaintiffs, no genuine issue of material fact existed. This was because it was undisputed, based on the pay rate sheet, that certain non-Hispanic crew members had smaller and fewer wage increases than the plaintiffs and therefore the plaintiffs were not paid in a manner incommensurate with similarly situated non-Hispanic crew. *Id.* at 467-68.

The same is true in this case. Even if Decker's data was skewed because it included the extra board members, it still showed that Plaintiff was the third highest earner in the pool compared to other regularly scheduled conductors, and therefore at least six non-African American, regularly scheduled conductors in the DT pool received lower pay than Plaintiff. And while Plaintiff asserts in his declaration that he was available to work more than the other regularly scheduled DT conductors, he has not come forward with evidence of a non-African American regularly scheduled DT conductor who had more deadheading and held-away opportunities, and therefore received higher pay, but was available to work less than Plaintiff. Absent such evidence, Plaintiff's

assertion that the majority of deadheading opportunities went to non-African American employees who therefore made more money than him is "belied by 'objective evidence in the record.'" *Martinez-Gonzalez*, 750 Fed.Appx. at 467 (quoting *Nelms v. Wellington Way Apartments, LLC*, 513 Fed.Appx. 541, 548 (6th Cir. 2013)). Accordingly, no genuine issue of material fact exists as to whether Yelder was paid less than similarly situated non-African American DT pool members. Plaintiff cannot establish the fourth element that is required to make out a *prima facie* case for his first disparate treatment claim.

As for Plaintiff's second disparate treatment claim—that he was terminated because of his race—Yelder argues Defendant conceded that he was "replaced" by a Caucasian conductor and therefore can make out the fourth element of his prima facie case. But that is not the case. Plaintiff sought the answer to the following interrogatory: "[s]tate the race of the person that took over Plaintiff's position following Plaintiff's termination." Defendant's Responses to Plaintiff's Second Set of Interrogatories, ECF No. 27-13, PageID.2074. Defendant responded:

> Subject to and without waiving any general objections, [Norfolk Southern] states that it is unclear what "took over" means, but no one was hired to replace Plaintiff because Plaintiff worked under a collective bargaining agreement and positions are filled based on who applies and seniority. [Norfolk Southern] further states that the race of the first person who performed the job Plaintiff was working at the time of his April 21, 2017 misconduct was White.

*Id.* Plaintiff asserts this shows he was "replaced" by a white conductor. But this interrogatory states that Yelder's job duties were redistributed among the existing DT pool crew members and that the next conductor to work was simply the next conductor in line using the first-in first-out process.  Such evidence is insufficient to meet the fourth prong. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) ("A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."); *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."). And Yelder does not allege or offer evidence that a non-African American conductor was *hired* to replace him or reassigned from another pool to the DT pool to take over his duties.

Further, Norfolk Southern has offered a legitimate, non-discriminatory reason for termination, *i.e.*, the altercation in the taxi. Yelder's response to Defendant's motion for summary judgment does not address how Defendant's legitimate, non-discriminatory reason was nonetheless pretextual as to Yelder's *race discrimination* claim.[12] And the record does not contain any evidence showing the existence of such

---

[12] Yelder does address pretext with regard to his retaliation claim.

pretext. *See* Analysis III.B. *infra*. Therefore, Plaintiff's race discrimination claim based on his termination fails as a matter of law. Consequently, Defendant's motion for summary judgment must be **GRANTED** as to Counts I and III.

## B. Retaliation Claims (Counts II and IV)

A Title VII claim of retaliation can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Absent direct evidence of retaliation, an employee must establish a *prima facie* case of retaliation by showing that "(1) he engaged in protected activity, (2) this exercise of his protected civil rights was known to the defendant, (3) the defendant thereafter took an employment action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action." *Imwalle v. Reliance Medical Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). "The final element requires proof of 'but-for' causation, meaning that the plaintiff must furnish evidence that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Barrow v. City of Cleveland*, 773 Fed.Appx. 254, 261 (6th Cir. 2019) (unpublished) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

If a plaintiff can make out her *prima facie* case, the burden then shifts to the employer "to produce evidence of a legitimate,

29

nondiscriminatory reason for its actions." *Imwalle*, 515 F.3d at 544. "The jury may not reject an employer's explanation . . . unless there is a sufficient basis *in the evidence* for doing so." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original). If the defendant can meet this burden, the plaintiff "must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Imwalle*, 515 F.3d at 544. In the Sixth Circuit, "a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009). The plaintiff must show "that the real reason for the employer's action was intentional retaliation," but "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Imwalle*, 515 F.3d at 544-45 (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000)).[13]

Norfolk Southern only disputes the final element of Yelder's *prima facie* case; it argues Plaintiff cannot show that but-for his complaint to Grace alleging racial discrimination he would not have been terminated.

---

[13] Defendant does not argue that Plaintiff's retaliation claims are precluded by the RLA.

ECF No. 24, PageID.124. Yelder argues the Court may infer but-for causation at the *prima facie* stage because he made his complaint of discrimination to Grace just under three months before he was terminated. ECF No. 27, PageID.1663. In *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004) the Sixth Circuit held as much, concluding that the temporal proximity of "just over three months" between a plaintiff's discrimination charge with the employment commission and his termination was "significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie case." *Id.* at 563 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000))

At the same time, the Sixth Circuit has "repeatedly cautioned against inferring causation based on temporal proximity alone." *Wasek v. Arrow Energy Servs. Inc.*, 682 F.3d 463, 471-72 (6th Cir. 2012) (citing *Spengler v. Worthington Cyclinders*, 615 F.3d 481, 494 (6th Cir. 2010) ("[T]emporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim.")). Indeed, "an employer is not bound to cease all investigation of an employee merely because the employee alleges discrimination." *Beard v. AAA of Michigan*, 593 F.App'x. 447, 451 (6th Cir. 2014). When there is an intervening "obviously nonretaliatory basis" for the adverse action, this evidence negates any inference of causation based on temporal causation. *Wasek*, 682 F.3d at 472. (citing *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th

Cir. 2010)). Just as in *Wasek*, here "the timeline of events extinguishes any inference based on temporal proximity" because Yelder struck a PTI driver during a deadheading trip three weeks *after* his complaint of discrimination was sent to Grace. Yelder also admitted to striking the driver, though he argued that he acted in self-defense. *Wasek*, 682 F.3d at 472. Thus, Norfolk Southern had an intervening legitimate reason to terminate Yelder, "and that reason dispels an inference of retaliation based on temporal proximity." *Id.* Because temporal proximity is the only evidence of causation offered by Yelder, and the inference of causation from this evidence is dispelled by the intervening misconduct of Yelder in striking the driver, he does not meet the element of causation and therefore cannot make out a *prima facie* case of retaliation.

Even if Yelder had shown a *prima facie* case, the burden would shift to Norfolk Southern to provide a legitimate non-discriminatory reason for terminating him. Norfolk Southern has done so here, pointing to Yelder's incident with the PTI taxi driver, Yelder's admission that his fist made contact with the taxi driver's body, and Norfolk Southern's conclusion that this amounted to a violation of the company's Safety Rule 900, conduct unbecoming an employee. *See Hampshire v. Henderson*, 14 Fed.Appx 397, 399-400 (6th Cir. 2001) (concluding that terminating a postal worker for engaging in a physical altercation with a road worker was a legitimate, non-discriminatory reason for termination).

And Plaintiff has not "demonstrate[d] by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Imwalle*, 515 F.3d at 544. To make this showing, Plaintiff has three options for showing pretext. Plaintiff may try to show that the physical altercation with the PTI driver: (1) had no basis in fact, (2) did not actually motivate Plaintiff's discharge, or (3) was insufficient to motivate Plaintiff's discharge. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Yelder does not present evidence to show that the altercation with the PTI driver did not in fact happen, or that the altercation was not sufficient to motivate his termination. Indeed, Defendant established that Plaintiff's "punishment was not disproportionate to his conduct" by including in the record six other instances where an employee's involvement in a physical altercation resulted in termination for violating Norfolk Southern policy. Bolander Declaration, ECF No. 24-10; *Jones v. City of Franklin*, 468 Fed.Appx. 557, 564 (6th Cir. 2012).

Instead, Plaintiff argues that the altercation did not actually motivate his discharge because Norfolk Southern cannot "establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Wright v. Murray*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998)). To prevail on its motion for summary judgment, Norfolk

Southern does not have to prove that its investigation of the physical altercation was perfect, but rather that its decision was "reasonably informed and considered." *Id.* Norfolk Southern does not even need to prove that Yelder violated company policy, only that Norfolk Southern "made its decision to terminate [Yelder] based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation." *Id.* at 709; *see also Graham v. Best Buy Stores, L.P.*, 298 Fed.Appx. 487, 494 (6th Cir. 2008).

Here, there is ample evidence that Yelder violated company policy and Norfolk Southern fired him for doing so. At the hearing preceding Plaintiff's termination, numerous individuals testified, including Plaintiff, Mr. Jackwak (the engineer who was in the vehicle with Yelder and the PTI driver), and Courtney Siffre (Plaintiff's direct supervisor). Plaintiff testified that he struck the driver. ECF No. 24-5, PageID.1113 (". . . that's when I struck him into his seat because I needed to get to that steering wheel, and he still did not stop immediately."). Plaintiff's written statement and his police report were also made part of the investigative record and confirmed Plaintiff's admission that he struck the PTI taxi driver. ECF No. 24-3, PageID.313-14, PageID.419. Additionally, Siffre testified that striking someone in the chest is encompassed in Rule 900, conduct unbecoming an employee. ECF No. 24-5, PageID.1084. Plaintiff contends that Norfolk Southern failed to consider his honest belief that he was in fear for his life and made physical contact with the PTI taxi

driver only as a last resort. But the record bears out that Norfolk Southern did take this into consideration, in that the panel heard Yelder testify to those fears, (ECF No. 24-5, PageID.1112) heard testimony that the PTI taxi driver deviated from the preferred route, and considered Jackwak's written statement indicating that the driver was acting strange, but was not being hostile. (ECF No. 24-5, PageID.1033). Importantly, Grace testified that he would not condone workplace violence, even if, as Plaintiff argued, he was merely acting in self-defense. Grace Deposition, ECF No. 24-5, PageID.990 ("There's a number of things he can do, but striking somebody and trying to take the keys and take over control of a vehicle while it's moving is extremely dangerous so I would say [Yelder should have done] anything but that.").

In sum, the Court finds that Plaintiff cannot show a *prima facie* case of retaliation because Plaintiff's only evidence of causation is temporal proximity and this temporal proximity is overcome by the independent, intervening cause of Plaintiff striking the PTI driver. However, even if he could make out a *prima facie* case, Plaintiff cannot demonstrate that Defendant's legitimate non-discriminatory reason for termination was not its true reason, but instead was a pretext designed to mask retaliation for Plaintiff's complaint to Grace. Accordingly, Defendant's motion for summary judgment is **GRANTED** as to Counts II and IV.

**IV. Conclusion**

For the reasons stated above, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 24).

**IT IS SO ORDERED**.

DATED: March 6, 2020.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

36